**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 13-1489

UNITED STATES OF AMERICA, EX REL.
KARL S. SCHUMANN, AND ON BEHALF OF THE
STATES OF CALIFORNIA, DELAWARE, THE DISTRICT
OF COLUMBIA, FLORIDA, HAWAII, ILLINOIS,
LOUISIANA, MASSACHUSETTS, NEVADA,
TENNESSEE, TEXAS AND VIRGINIA;
KARL S. SCHUMANN

v.

ASTRAZENECA PHARMACEUTICALS L.P.;
ASTRAZENECA LP; BRISTOL-MYERS SQUIBB
COMPANY; E.I. DUPONT DE NEMOURS & COMPANY;
DUPONT PHARMACEUTICALS COMPANY

Karl S. Schumann,
Appellant

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D. C. No. 2-03-cv-05423)
District Judge:  Honorable J. William Ditter, Jr.

Argued on November 6, 2013


Before: GREENAWAY, JR., VANASKIE and ROTH,
<u>Circuit Judges</u>


(Opinion filed: October 20, 2014)

W. Scott Simmer, Esquire
Paul M. Honigberg, Esquire **(Argued)**
Thomas J. Poulin, Esquire
Blank Rome LLP
600 New Hampshire Avenue, N.W.
Washington, D.C. 20037

Stephen M. Orlofsky, Esquire
Nicholas C. Harbist, Esquire
Blank Rome LLP
301 Carnegie Center, Third Floor
Princeton, New Jersey 08540

Counsel for Appellant


Mark E. Haddad, Esquire **(Argued)**
Collin P. Wedel, Esquire
Sidley Austin LLP
555 West Fifth Street
Suite 4000
Los Angeles, CA 90013

Michael P. Doss, Esquire
Sidley Austin LLP
One South Dearborn Street
Suite 1250
Chicago, IL 60603

Counsel for Appellees AstraZeneca LP
and AstraZeneca Pharmaceuticals L.P.


Catherine E. Stetson, Esquire **(Argued)**
Jessica L. Ellsworth, Esquire
David M. Ginn, Esquire
Hogan Lovells US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004

Thomas M. Gallagher, Esquire
Pepper Hamilton
Suite 1250
18th & Arch Streets
3000 Two Logan Square
Philadelphia, PA 19103

Counsel for Appellees Bristol-Myers
Squibb Company,
DuPont Pharmaceuticals, Company, and
E.I. Du Pont
De Nemours & Company

3

OPINION

**ROTH**, Circuit Judge:

Plaintiff Karl S. Schumann, proceeding as a *qui tam* relator under the False Claims Act (FCA), 31 U.S.C. § 3729 *et seq.*, and corresponding state laws, appeals the District Court's orders granting motions to dismiss by defendants Bristol-Meyers Squib Company, E.I. du Pont de Nemours and Company, and DuPont Pharmaceuticals Company (together, BMS), and defendants AstraZeneca Pharmaceuticals LP and AstraZeneca LP (together, AZ). Schumann alleges defendants (1) improperly induced Medco Health Solutions, Inc., his employer, to offer certain of defendants' drugs in its mail-order pharmacies and in health plans it managed; (2) did not include those inducements when calculating the best price for their drugs, and thus submitted inaccurate best price reports to the government; (3) overcharged the government based on those inaccurate best prices; and (4) underpaid rebates owed based on those inaccurate best prices.

The District Court found it lacked subject matter jurisdiction over Schumann's claims because he did not have the requisite direct and independent knowledge to satisfy the original source exception to the FCA's public disclosure bar. As a result, the court dismissed Schumann's claims with prejudice. We will affirm.

4

## I.    Background

### A.    FCA Statutory Framework

As we have previously explained in great detail, the FCA makes it unlawful to knowingly submit a fraudulent claim to the government. *See, e.g.*, *United States ex rel. Paranich v. Sorgnard*, 396 F.3d 326, 331-32 (3d Cir. 2005); *United States ex rel. Dunleavy v. Cnty. of Del.*, 123 F.3d 734, 738 & n.6 (3d Cir. 1997); *United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Prudential Ins. Co.*, 944 F.2d 1149, 1153-54 (3d Cir. 1991). "The *qui tam* provision of the [FCA], permits, in certain circumstances, suits by private parties on behalf of the United States against anyone submitting a false claim to the Government. Prior to 1986, such suits were barred if the information on which they were based was already in the Government's possession." *Hughes Aircraft Co. v. United States ex rel. Schumer*, 520 U.S. 939, 941 (1997).

In 1986, Congress amended the FCA to encourage private plaintiffs—relators, in FCA parlance—to bring civil cases if they had information that someone had defrauded the government. *See* False Claims Amendments Act (FCAA), Pub. L. No. 99-562, 100 Stat. 3153 (codified at 31 U.S.C. § 3729-33 (1988)); *Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 293-95, 298 (2010). But, "to strike a balance between encouraging private persons to root out fraud and stifling parasitic lawsuits," *Graham Cnty.*, 559 U.S. at 295, Congress added the public disclosure bar to withdraw jurisdiction over, among other things, suits based on information that had been

5

previously disclosed unless "the person bringing the action is an original source of the information." FCAA § 3 (codified at 31 U.S.C. § 3730(e)(4)(A));[1] *see also United States ex rel. Atkinson v. Pa. Shipbuilding Co.*, 473 F.3d 506, 518-19 & n.20 (3d Cir. 2007) (describing purpose behind FCAA and public disclosure bar). Congress defined an "original source" as "an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information." FCAA § 3 (codified at 31 U.S.C. § 3730(e)(4)(B)).

---

[1] In full, the FCAA's public disclosure bar provided:

> No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

In 2010, Congress amended Section 3730(e)(4). *See* Patient Protection and Affordable Care Act (PPACA), Pub. L. No. 111-148, § 10104(j)(2), 124 Stat. 119, 901-02 (2010). Because that amendment does not apply retroactively to Schumann's 2003-filed case, *see Graham Cnty.*, 559 U.S. at 283 n.1, we will discuss the now-superseded version of the FCA in the present tense and refer to that version as if it were still in force.

6

## B.     Medicaid and Related Statutory Framework

Under the Medicaid Drug Rebate Program, a participating drug manufacturer agrees to pay rebates to state Medicaid programs in exchange for those programs covering the cost of a manufacturer's drugs. *See* Omnibus Reconciliation Act of 1990, Pub. L. No. 101-508, § 4401, 104 Stat. 1388 (1990) (codified as amended at 42 U.S.C. § 1396r-8 (2012)); *see also Astra USA, Inc. v. Santa Clara Cnty*, 131 S. Ct. 1342, 1345-46 (2011).  The Department of Health and Human Services (HHS) determines the amount of the rebate using a statutory formula based on a manufacturer's average and best prices for a particular drug.  *See, e.g.*, 42 U.S.C. § 1396r-8(c).   Each manufacturer calculates these prices— which is "a complex enterprise requiring recourse to detailed information about the company's sales and pricing," *Astra*, 131 S. Ct. at 1346 (citing 42 U.S.C. § 1396r–8(k); 42 C.F.R. §§ 447.500–520) (2010)[2]—and submits them to HHS each quarter, 42 U.S.C. § 1396r–8(b)(3).  HHS may not disclose a manufacturer's reported prices except in certain circumstances.  *Astra*, 131 S. Ct. at 1346 (citing 42 U.S.C. § 1396r-8(b)(3)(D) (2010)).

---

[2]  Subject to certain exceptions, the reported best price is "the lowest price available from the manufacturer during the rebate period to any wholesaler, retailer, provider, health maintenance organization, nonprofit entity, or governmental entity within the United States."   42 U.S.C. § 1369r-8(c)(1)(C)(i).    Among other things, the best price must account for certain cash discounts, free goods, volume discounts, and rebates. *Id.* § 1396r-8(c)(1)(C)(ii).

Pertinent here, a drug maker participating in Medicaid must also comply with Section 340B of the Public Health Service Act, 42 U.S.C. § 256b(a). That section prohibits a manufacturer from charging certain state-operated programs that receive federal funds more than the average price for its drugs, as defined by the Medicaid Drug Rebate Program, less a specified rebate percentage. *See Astra*, 131 S. Ct. at 1346. In addition, the federal anti-kickback statute (AKS) prohibits a drug maker from knowingly offering any remuneration to induce others to cause the government to pay for its drugs. Medicare and Medicaid Patient Protection Act, Pub. L. No. 92-603, 86 Stat. 1419, 1454 (codified at 42 U.S.C. § 1320a-7b(b)) (1972).[3]

At all relevant times, BMS participated in Medicaid's Drug Rebate Program with regard to its anticoagulant Coumadin, and AZ participated in the program with regard to its proton pump inhibitors (PPIs) Nexium and Prilosec. Both companies also participated in the Section 340B program with those drugs, and sold those drugs to government health care programs. Therefore, the companies were prohibited from, and subject to liability under the FCA for, misreporting their average and best prices for those drugs, over-charging or under-rebating the government based on those prices, and improperly inducing others to cause the government to pay for their drugs. *See, e.g.*, *United States ex rel. Wilkins v. United Health Grp., Inc.*, 659 F.3d 295, 311-13 & n.19 (3d Cir. 2011) (finding FCA claim properly pleaded where plaintiff alleged defendant's claim for payment was false due

---

[3] Congress's 2010 amendment of the AKS, *see* PPACA § 6402(f), 124 Stat. at 759, also does not apply retroactively here. *See Graham Cnty.*, 559 U.S. at 283 n.1.

8

to a violation of the pre-PPACA AKS); *Hutchins v. Wilentz, Goldman & Spitzer*, 253 F.3d 176, 182-83 (3d Cir. 2001) (noting FCA liability attaches to conduct that causes or would cause government economic loss).

### C.      Facts and Procedural History

From 1999 to 2003, Schumann was Vice President of Pharmaceutical Contracting for Medco, a large national pharmacy benefit manager (PBM).   As a PBM, Medco manages mail-order pharmacies and pharmacy benefits for health plans, including those offered by various federal and state government entities to qualifying employees, and contracts with drug makers, including BMS and AZ, to offer their products in the health plans Medco manages.   Health plans retain PBMs such as Medco "to efficiently manage their benefit plans and to achieve cost savings" by "negotiating discounts or rebates from drug manufacturers, providing mail order prescription service to plan members, contracting with retail pharmacies for reimbursement when prescriptions are filled for plan members, and electronic processing and paying of claims."   *In re Pharmacy Benefit Mgrs. Antitrust Litig.*, 582 F.3d 432, 434 (3d Cir. 2009).   As a result, Medco had the power to determine whether BMS's and AZ's products would be available to patients covered by plans it managed, to negotiate the price at which such products would be available, and to influence the average and best prices for BMS and AZ products.

Schumann filed his initial Complaint under seal in the Eastern District of Pennsylvania on September 26, 2003, on behalf of the federal government, eleven states, and the District of Columbia.   Schumann subsequently filed under

9

seal a First Amended Complaint on November 9, 2005, and a Second Amended Complaint on November 22, 2006. On June 15, 2009, after the government declined to intervene, the District Court lifted the seal for all matters occurring on or after that date and accepted Schumann's Third Amended Complaint (TAC) for filing.

BMS moved to dismiss the TAC under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), arguing Schumann was not an original source under the FCA and had failed to state a claim upon which relief could be granted. Schumann responded by seeking leave to further amend his complaint to address the issues in BMS's motion and to avoid any delay resulting from a dismissal without prejudice. The court granted Schumann's request and denied BMS's motion as moot. Schumann then filed the Corrected Fourth Amended Complaint (CFAC), the operative pleading.

In the CFAC, Schumann alleges that, from December 1997 until March 2003, BMS induced Medco to make Coumadin the exclusive anticoagulant in its mail-order pharmacies by paying sham data fees and rebates up to 63% off Coumadin's wholesale price. Schumann further alleges BMS improperly omitted those payments when calculating Medco's cost for Coumadin, thereby avoiding setting a new best price for the drug and inaccurately reporting its best price to the government.

Schumann states that he learned of BMS's conduct through his job at Medco. More precisely, he pleads facts indicating that he reviewed confidential agreements between Medco and BMS providing for data fees and rebates, discussed the history of those agreements with Medco and

10

BMS officials, and negotiated extensions of those agreements (including an increase in Medco's rebate). He further asserts that BMS paid Medco such high rebates and fees because it intended to provide kickbacks while evading applicable best-price reporting statutes.

Schumann further alleges that from 1996 through 2007, AZ used improper rebates and payments to induce Medco to offer Prilosec and Nexium as the exclusive PPIs in Medco's mail-order pharmacies, and to prefer those drugs in the formularies of two health plans Medco managed. Specifically, Schumann alleges AZ withheld Prilosec rebates unless Medco placed Nexium on its preferred formulary, paid post-patent rebates on Prilosec if Medco preferred Nexium over generic PPIs, reduced Medco's cost of Prilosec and Nexium to match the cost of generics, and charged Medco the cost of a generic if Medco substituted Prilosec for a generic prescription. In addition, Schumann alleges AZ improperly paid Medco and health plans it managed $100 million under two disease-management agreements, $500,000 via an educational grant to "push Prilosec," $1.2 million to market Nexium, and $200,000 to subsidize use of the AZ data-analysis program RationalMed. Finally, Schumann alleges AZ improperly failed to incorporate these rebates and payments into its best-price calculations, and thereby submitted false best-price reports and caused the government to overpay for AZ drugs. Schumann states that he learned about AZ's improper activity in his role at Medco. Specifically, he says he gained the knowledge by reviewing contracts between Medco and AZ and internal Medco documents describing the history of the companies' dealings; discussing rebates, formulary placement, disease-management agreements, and other

11

payment vehicles with Medco colleagues and AZ officials; negotiating extensions of various agreements and structuring them to entice health plans managed by Medco to favor AZ PPIs; and, at AZ's behest, encouraging those plans to favor AZ PPIs. In addition, he asserts that it was AZ's intent to bribe Medco and plans it managed to favor AZ PPIs and to structure deals to evade best-price reporting obligations.

Based on these allegations, the CFAC brings four FCA claims against each defendant, under AKS-violation and inaccurate best-price theories of liability.[4] First, Schumann contends defendants knowingly presented or caused to be presented to the government false claims for payment. *See* 31 U.S.C. § 3729(a)(1). Second, he contends defendants knowingly made or used, or caused to be made or used, false records or statements that caused false claims to be paid or approved by the government. *See id.* § 3729(a)(2). Third, he contends defendants knowingly conspired with Medco and others to violate Sections 3729(a)(1) and (2). *See id.* § 3729(a)(3). Finally, he contends defendants avoided or decreased their obligations to pay the government by knowingly making or using false records or statements, or by causing such records to be made or used. *See id.* § 3729(a)(7).

---

[4] In 2009, Congress amended the FCA and re-designated 31 U.S.C. §§ 3729(a)(1)-(7) as 31 U.S.C. §§ 3729(a)(1)(A)-(G). Fraud Enforcement and Recovery Act of 2009 (FERA), Pub. L. No. 111–21, § 4, 123 Stat. 1617, 1621-22 (2009). Because Schumann's claims arose before 2009, the CFAC properly cites the pre-FERA version of the FCA. *See Wilkins*, 659 F.3d at 303. We do so as well.

12

Defendants separately moved to dismiss the CFAC with prejudice. BMS again moved under Rule 12(b)(1), arguing the FCA's public disclosure bar divested the court of jurisdiction, and both BMS and AZ moved under Rule 12(b)(6), arguing Schumann had not pleaded the facts underlying his claims with sufficient particularity. Schumann opposed both defendants' motions. The court granted BMS's motion, finding that Schumann's claims against BMS were substantially similar to prior public disclosures and that Schumann lacked the requisite knowledge to be an original source under the FCA. The court also found that amending the CFAC would be futile and therefore dismissed Schumann's claims with prejudice. The court denied AZ's motion, however, because it found that Schumann had alleged AZ's fraud with sufficient particularity.

Schumann timely moved for reconsideration as to claims against BMS, arguing that he satisfied the FCA's original source exception.[5] In support of his motion, Schumann submitted a twelve-page declaration purporting to add facts that he had omitted from the CFAC. In pertinent part, he stated he had learned of BMS's conduct by reviewing existing agreements and internal documents in Medco files, discussing them with Medco colleagues, negotiating rebate and data fee agreements with BMS, and comparing the terms of those agreements with others he had seen in his years in the pharmacy-benefits industry. He further stated that in negotiations that had occurred before he arrived at Medco, and in those in which he participated, BMS officials had

---

[5] Schumann did not challenge the court's finding that his claims against BMS were based on publicly disclosed information.

13

expressed concern about setting a new best price for Coumadin. Finally, he stated that he had deduced, based on his "cumulative knowledge" and the supposed irrationality of the terms to which BMS had agreed, that BMS was illegally paying kickbacks to Medco and misreporting Coumadin's best price. In a written decision, the court declined to consider Schumann's supplemental declaration, because it was not new evidence, and denied his motion for reconsideration.

AZ then moved to dismiss the CFAC under Rule 12(b)(1). Schumann opposed the motion and submitted a thirty-five page declaration to further explain his duties at Medco and how he learned about AZ's allegedly inappropriate conduct. Specifically, he described reviewing internal files and documents; speaking with Medco colleagues and officials from AZ and plans managed by Medco; participating in rebate and formulary negotiations with AZ and those plans; and encouraging those plans to accept AZ's inducements and to prefer its PPIs. He also added that his knowledge of AZ's dealings and his experience in the industry led him to conclude that AZ was paying kickbacks to Medco and health plans it managed, and skirting its best-price obligations. The court granted AZ's motion, finding that Schumann's claims against AZ, like those against BMS, were based on publicly disclosed information and that he was not an original source under the FCA. The court also dismissed Schumann's claims against AZ with prejudice because it found further amendment of the CFAC would be futile. Schumann timely appealed dismissal of all claims in the CFAC.

14

## II.  Discussion

### A.  Jurisdiction

Schumann brought his FCA claims in federal court pursuant to 31 U.S.C. § 3732.  We have jurisdiction to review the District Court's final orders under 28 U.S.C. § 1291.

### B.  Standard of Review

This Court exercises plenary review over a district court's dismissal for lack of subject matter jurisdiction. *Paranich*, 396 F.3d at 331 (citing *Stinson*, 944 F.2d at 1152).

The parties agree that AZ's motion to dismiss was a factual attack on jurisdiction, but they disagree about whether BMS's motion to dismiss was a facial or factual attack.  The distinction is theoretically important because a court may consider matters outside the pleadings in a factual challenge, but must take the complaint at face value and construe it as true in a facial challenge.  *See Atkinson*, 473 F.3d at 514 (citing *Gould Electronics Inc. v. United States*, 220 F.3d 169, 176-78 (3d Cir. 2000)).  Here, however, the distinction makes no difference:  as we detail below, neither the CFAC's allegations alone, nor those allegations plus Schumann's supplemental declarations, meet his burden to satisfy that he is an original source of his claims against either BMS or AZ. *See Atkinson*, 473 F.3d at 515 (noting relator's burden to plead or prove jurisdiction).

## C.    Original Source Exception[6]

We have previously expounded on what it means to have both "direct and independent knowledge" under the original source exception to the FCA's public disclosure bar. *See Stinson*, 944 F.2d at 1160 (noting conjunctive "and" indicates "direct" and "independent" each impose distinct requirements). "'Direct knowledge' is knowledge obtained without any 'intervening agency, instrumentality, or influence: immediate.'" *Atkinson,* 473 F.3d at 520 (quoting *Stinson*, 944 F.2d at 1160). Such knowledge has also been described as "first-hand, seen with the relator's own eyes, unmediated by anything but [the relator's] own labor, and by the relator's own efforts, and not by the labors of others, and . . . not derivative of the information of others." *Paranich,* 396 F.3d at 336 & n.11 (internal quotation marks and citations omitted); *see also Stinson*, 944 F.2d at 1161 (citing with approval cases finding information is not direct if learned from "a whistleblowing insider" or by "stumbl[ing] across an interesting court file"). The independent knowledge requirement means that "knowledge of the fraud cannot be merely dependent on a public disclosure." *Paranich*, 396 F.3d at 336 (quoting *United States ex rel. Hafter v. Spectrum Emergency Care, Inc.*, 190 F.3d 1156, 1160 (10th Cir. 1999)). In other words, "a relator who would not have learned of the information absent public disclosure [does] not have 'independent' information" under the FCA. *Stinson*, 944 F.2d at 1160.

---

[6] Schumann does not appeal the finding below that all of his claims are based on publicly disclosed information, and are thus barred unless he is an original source under the FCA.

16

We have also described the type of information a relator must know directly and independently. In *Stinson*, for example, we explained that:

> Undoubtedly, it is not necessary for a relator to have all the relevant information in order to qualify as "independent." Nonetheless, the relator must possess substantive information about the particular fraud, rather than merely background information which enables a putative relator to understand the significance of a publicly disclosed transaction or allegation. If the latter were enough to qualify the relator as an "original source," then a cryptographer who translated a ciphered document in a public court record would be an "original source," an unlikely interpretation of the phrase.

*Id*. (internal citation omitted). We expanded on *Stinson* eight years later, holding that a relator was "not an 'original source' because it did not have 'direct and independent knowledge' of the most critical element of its claims, *viz.*, that the [defendant] had made the alleged misrepresentations to [the government] . . .." *United States ex rel. Mistick PBT v. Housing Auth. of the City of Pitt.*, 186 F.3d 376, 388 (3d Cir. 1999) (citing *Stinson*, 944 F.2d at 1160).[7] Stated differently,

---

[7] *Accord In re Nat. Gas Royalties*, 562 F.3d 1032, 1046 (10th Cir. 2009) (relator needs direct and independent knowledge of "substantial" portion of allegations); *United States v. N.Y. Med. Coll.*, 252 F.3d 118, 121 (2d Cir. 2001) (relator must be original source of "core information"); *United States ex rel.*

17

although a relator need not "'have all the relevant information in order to qualify as "independent,"' a relator cannot be said to have 'direct and independent knowledge of the information on which [its fraud] allegations are based,' if the relator has no direct and independent knowledge of the allegedly fraudulent statements." *Id.* at 389 (quoting *Stinson*, 944 F.2d at 1160).

Although not previously discussed in the original source context, the algebraic expression we have used to aid our analysis of whether the information underlying a relator's claim has been publicly disclosed also serves as a helpful guidepost for understanding what information a relator must know directly and independently. As we laid out in *Atkinson*:

> "[I]f $X + Y = Z$, Z represents the allegation of fraud and X and Y represent its essential elements. In order to disclose the fraudulent transaction publicly, the combination of X and Y must be revealed, from which readers or listeners may infer Z, i.e., the conclusion that fraud has been committed." To draw an inference of fraud, both a misrepresented [X] and a true [Y] state of facts must be publicly disclosed. So, if either Z (fraud) or both X (misrepresented facts) and Y (true facts) are disclosed . . . then a relator is barred from bringing suit under §

*Springfield Terminal Ry. Co. v. Quinn*, 14 F.3d 645, 657 (D.C. Cir. 1994) (requiring direct and independent knowledge of "any essential element of the underlying fraud transaction").

18

> 3730(e)(4)(A) unless he is an original
> source.

*Atkinson*, 473 F.3d at 519 (quoting *Dunleavy*, 123 F.3d at 741). Extending this reasoning into the analysis under Section 3730(e)(4)(B), a relator must have direct and independent knowledge of either Z, the alleged fraud, or both X and Y, the false and true sets of facts, to qualify under the FCA's original source exception. *See Atkinson*, 473 F.3d at 519; *see also Springfield Terminal*, 14 F.3d at 657.

## D. Application

Having outlined the contours of the original source exception, we now apply that law to the facts at bar to determine whether Schumann is an original source of the information underlying each of his claims. *See Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 476 (2007) ("Section 3730(e)(4) does not permit jurisdiction in gross just because a relator is an original source with respect to some claim."); *see also United States ex rel. Merena v. SmithKline Beecham Corp.*, 205 F.3d 97, 101-02 (3d Cir. 2000) (noting FCA's reference to "action" may reasonably be read to mean "claim" because the statute envisions a single-claim complaint).

### 1. Claims Against BMS

Schumann alleges he obtained direct and independent knowledge of his AKS and best-price claims against BMS in the same fashion. Specifically, he states in the CFAC that he learned of BMS's allegedly improper conduct by reviewing confidential data fee and rebate agreements, discussing them with his Medco colleagues and BMS officials, and

19

negotiating their extension. In his supplemental declaration, Schumann repeats the bases for his knowledge mentioned in the CFAC, and adds that he reviewed confidential documents in Medco's negotiation files, discussed them with colleagues, and understood that BMS was concerned the agreements would set a new best price for Coumadin. He also states that his experience led him to conclude that BMS could not have afforded to enter into the rebate and data fee agreements if it was complying with applicable anti-kickback and best-price statutes.

None of these allegations is sufficient for Schumann to plead that he is an original source of the key components of his claims against BMS. First, knowledge of a scheme is not direct when it is gained by reviewing files and discussing the documents therein with individuals who actually participated in the memorialized events. *See Paranich*, 396 F.3d at 335-36; *Stinson*, 944 F.2d at 1160-61. Second, Schumann's description of his involvement in Medco's business with BMS, including negotiating rebate and data fee agreements and recognizing that BMS was aware of its best-price reporting obligations, does not evince direct and independent knowledge of any improper kickback or inaccurate best-price report. *See Paranich*, 396 F.3d at 336 & n.11 (noting such knowledge gained when relator's involvement constituted filing false claims on defendant's behalf); *Houck on behalf of the United States v. Folding Admin. Comm.*, 881 F.2d 494, 505 (7th Cir. 1989) (finding relator's knowledge direct when he was involved by helping others file false claims); *see also In re Pharmacy Benefit Mgrs. Antitrust Litig.*, 582 F.3d at 434 (explaining PBMs negotiate discounts and rebates from drug makers). Finally, Schumann's conclusions that BMS intended to pay kickbacks to Medco and to submit false

20

claims to the government, based on his experience in and understanding of the PBM industry, do not qualify as independent knowledge under the FCA. *See, e.g.*, *United States ex rel. Zizic v. Q2Administrators, LLC*, 728 F.3d 228, 240 (3d Cir. 2013) ("[W]e have repeatedly rejected the argument that a relator's knowledge is independent when it is gained through the application of expertise to information publicly disclosed under § 3730(e)(4)(A)." (citing *Atkinson*, 473 F.3d at 526 n.27; *Stinson*, 944 F.2d at 1160)); *see also Rockwell*, 549 U.S. at 475-76 (rejecting FCA claim premised on relator correctly predicting submission of a false claim); *United States ex rel. Vuyyuru v. Jadhav*, 555 F.3d 337, 353 (4th Cir. 2009) ("[M]ere suspicion that there must be a false or fraudulent claim lurking around somewhere simply does not carry [relator's] burden of proving that he is entitled to original source status.").

At bottom, then, the facts alleged in Schumann's CFAC and supplemental declaration do not indicate he has direct and independent knowledge of BMS's actual best price for Coumadin or how it was calculated; the inaccurate best price BMS reported to the government or how it was calculated, or any improper payments made to Medco or its health plans; or any false or fraudulent claim submitted or caused to be submitted by BMS. *See Atkinson*, 473 F.3d at 519-20. Therefore, Schumann does not qualify as an original source of his FCA claims against BMS.

### 2.    Claims Against AZ

Schumann also purports to show direct and independent knowledge of the information underlying his AKS and best-price claims against AZ. In the CFAC, he

pleads that he learned of AZ's alleged kickback and best-price-misreporting schemes by reviewing confidential agreements and internal documents reflecting the history of relations between Medco and AZ; discussing formularies, rebates, various fee arrangements, and best-price implications with Medco colleagues and AZ officials; negotiating extensions of those agreements and arrangements; and encouraging health plans managed by Medco to favor AZ PPIs. Schumann repeats these factual bases in his supplemental declaration in opposition to AZ's motion to dismiss, and adds that, based on his years of experience, AZ paid kickbacks to Medco and health plans it managed, and failed to incorporate those payments into applicable best-price reports.

Under the now-familiar case law, these allegations are insufficient to plead original source status. As discussed above, Schumann's knowledge is not direct because it came from reviewing documents and discussing them with colleagues who participated in the underlying events. *See Paranich*, 396 F.3d at 335-36; *Stinson*, 944 F.2d at 1160-61. In addition, although he has direct and independent knowledge of AZ's business strategies, and of certain payments made by AZ to Medco and health plans it managed (which he pejoratively terms "Special Deals"), he does not have such knowledge that those strategies or payments involved kickbacks or submission of inaccurate best-price reports. And his knowledge that AZ was aware of its best-price obligations does not indicate AZ intended to evade such obligations. Instead, Schumann substitutes experience-based belief that misconduct was occurring for the requisite direct and independent knowledge. This is plainly insufficient to qualify as an original source under the FCA. *See, e.g.*, *Zizic*,

728 F.3d at 240 (citing *Atkinson*, 473 F.3d at 526 n.27; *Stinson*, 944 F.2d at 1160-61); *see also Rockwell*, 549 U.S. at 475-76.

Therefore, Schumann fails to aver facts indicating he has direct and independent knowledge of any improper kickbacks from AZ to Medco or to health plans Medco managed; AZ's actual best price for Prilosec or Nexium; AZ's reported best price for those drugs; how AZ calculated the actual or reported best prices for Prilosec or Nexium; or any false or fraudulent claim submitted or caused to be submitted by AZ. *See Atkinson*, 473 F.3d at 519-20. Accordingly, he is not an original source of the information underlying his FCA claims against AZ.[8]

## E.      Denial of Schumann's Motion For

## Reconsideration As To BMS

The Court reviews "a denial of a motion for reconsideration for abuse of discretion, but we review the District Court's underlying legal determinations *de novo* and factual determinations for clear error." *Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 246 (3d Cir. 2010).

"The purpose of a motion for reconsideration ... is to

---

[8] Because we find Schumann lacked the requisite knowledge to qualify as an original source of any of his claims, we need not decide whether he "voluntarily provided the information [underlying his claims] to the Government before filing" his claims. 31 U.S.C. § 3730(e)(4)(B).

23

correct manifest errors of law or fact or to present newly discovered evidence." *Max's Seafood Café v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999). "Accordingly, a judgment may be altered or amended if the party seeking reconsideration shows at least one of the following grounds: (1) an intervening change in the controlling law; (2) the availability of new evidence that was not available when the court granted the motion for summary judgment; or (3) the need to correct a clear error of law or fact or to prevent manifest injustice." *Id.* (citation omitted).

In support of his motion for reconsideration, Schumann submitted his twelve-page supplemental declaration in an attempt to plead the facts the District Court had found the CFAC lacked. The court followed Third Circuit precedent and declined to consider such "new" evidence, which Schumann could have submitted in opposition to BMS's motion to dismiss. *See id.* The court therefore did not abuse its discretion in disregarding Schumann's supplemental declaration. *See Howard Hess Dental Labs.*, 602 F.3d at 251-52 (citing *Harsco Corp. v. Zlotnicki*, 779 F.2d 906, 909 (3d Cir. 1985)).[9] And it did not abuse its discretion in denying Schumann's reconsideration motion, which was not based on a change in law, newly available evidence, or manifest injustice. *See Max's Seafood Café*, 176 F.3d at 677.

---

[9] In any event, as discussed above, the District Court would have been correct in denying Schumann's motion for reconsideration even if it had accepted the statements in Schumann's supplemental declaration.

24

## F.    Dismissal With Prejudice

Finally, we review the District Court's denial of leave to amend for abuse of discretion, and review *de novo* its determination that amendment would be futile.  *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1434 (3d Cir. 1997).

Under Rule 15(a), "the court should freely give leave when justice so requires."  A district court may deny leave to amend a complaint where it is apparent from the record that "(1) the moving party has demonstrated undue delay, bad faith or dilatory motives, (2) the amendment would be futile, or (3) the amendment would prejudice the other party." *Lake v. Arnold*, 232 F.3d 360, 373 (3d Cir. 2000) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)).  In addition, "[a] District Court has discretion to deny a plaintiff leave to amend where the plaintiff was put on notice as to the deficiencies in his complaint, but chose not to resolve them."  *Krantz v. Prudential Invs. Fund Mgmt. LLC*, 305 F.3d 140, 144 (3d Cir. 2002) (citing *Rolo v. City Investing Co. Liquidating Trust*, 155 F.3d 644, 654 (3d Cir. 1998)).

Schumann was on notice of the deficiencies in the CFAC after BMS moved to dismiss the TAC with prejudice, and he has had many opportunities over the seven-plus years and five iterations of the complaint to plead facts indicating he was an original source; if he could plead such facts, he would have already done so. *See Gasoline Sales, Inc. v. Aero Oil Co.*, 39 F.3d 70, 74 (3d Cir. 1994) (noting, where plaintiff sought to add facts to a twice-amended complaint, "three attempts at a proper pleading is enough"); *see also Atkinson*, 473 F.3d at 517 ("Repleading is futile [after dismissal for lack

25

of subject matter jurisdiction] because the legal inadequacy cannot be solved by providing a better factual account of the alleged claim."). Accordingly, we affirm dismissal of Schumann's claims with prejudice because further amendment would be futile.

## III.  CONCLUSION

For the foregoing reasons, we will affirm the judgment of the District Court.